## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| Christine Zeld, | |
| Plaintiff, | Case No. 24-cv- |
| v. | Hon.<br>United States District Judge |
| EasyKnock, Inc., and EK Real Estate Fund 1, LLC, | Hon.<br>United States Magistrate Judge |
| Defendants. | |

## <u>VERIFIED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL</u>

### TABLE OF CONTENTS

INTRODUCTION................................................................................2

PARTIES, JURISDICTION, AND VENUE.......................................16

FACT ALLEGATIONS......................................................................17

  EasyKnock's "Sell & Stay" Transaction is an Equitable Mortgage ................17

  EasyKnock's "Sell & Stay" Transaction Contains Oppressive Terms and Defendants Induce Customers through Fraud .................................................19

    EasyKnock Only Considered Plaintiff's Equity in her Home ....................19

    EasyKnock Fraudulently Induced Plaintiff into its "Sell & Stay" Transaction and Unjustly Enriched itself through this Asymmetrical Transaction .................................................................................................21

    EasyKnock's Lease Agreement is Intended to Trigger a Default; Predictably, Plaintiff is Past-Due on her Account and faces Imminent Eviction .........................................................................................................25

    EasyKnock's Option Agreement is an Illusory Promise that Functions as an Integral Part of the Equitable Mortgage .....................................................26

EasyKnock Engages in Deceptive and Unfair Consumer Practices Designed to Ensnare Unsophisticated, Financially Distressed Homeowners in a Transaction that Causes them to Lose their Homes.....................................30

Allegations Specific to Plaintiff.........................................................35

COUNT I: Declaratory Action for an Equitable Mortgage ..................................42
COUNT II: Declaratory Action that EasyKnock's "Sell & Stay" Transaction is Not Arbitrable..................................................................................45

The Lease Agreements' Arbitration Clauses are Void .................................46

Federal Law Prohibits Arbitration Clauses in Transactions  Secured by Home Equity ...........................................................................47

Defendants' Arbitration Clauses are also Void and Unenforceable because they are Procedurally and Substantively Unconscionable...........................49

COUNT III: Violations of the Truth in Lending Act (TILA) and Home Ownership Equity Protection Act (HOEPA), 15 U.S.C. §§ 1601 et seq. ............51
COUNT IV: Violations of Michigan's Consumer Protection and Unfair Practices Act, MCL 445.901 et seq. ..................................................................58
COUNT V: Violations of the Mortgage Brokers, Lenders, and Servicers Licensing Act, MCL 445.1651 et seq. ("MBLA")..........................................66
COUNT VI: Violations of the Michigan Usury Act,  MCL 438.31 et seq. .........68
Count VII: Fraud in the Inducement...................................................69
Count VIII: Unjust Enrichment.........................................................70
REQUEST FOR RELIEF ...................................................................72

Equitable Remedies Pertaining to Counts I and II: ......................................72

Relief Pertaining to Count III, Violations of the TILA and HOEPA:..............72

Relief Pertaining to Counts IV, V and VI ...............................................74

Relief Pertaining to Count VII, Fraud in the Inducement ..............................76

Relief Pertaining to Count VIII, Unjust Enrichment .....................................76

## INTRODUCTION

1.    This is an action for injunctive relief, declaratory relief, equitable relief, and money damages brought by Plaintiff against Defendants EasyKnock, Inc. and its wholly owned entity EK Real Estate Fund 1, LLC (collectively, "Defendants" or "EasyKnock") based on violations of federal and state laws

designed to protect consumers and homeowners from the deceptive and illegal business practices perpetrated by Defendants on Plaintiff.[1]

2.     This case arises out of a deceptive and unfair lending scheme under which the Defendants lured Christine Zeld, a homeowner with poor credit, but with significant home equity, into an unlawful, usurious loan known as "Sell & Stay" transactions.

3.     While Defendant's "Sell & Stay" transaction is ostensibly structured as a sale-and-lease-back scheme, in fact, it bears all the hallmarks of what Michigan courts have long held to be an "equitable" or "disguised" mortgage. The primary hallmarks of a disguised mortgage are: the adverse financial position of the grantor, the intent of the parties, and the inadequacy of the purchase price for the property.[2]

4.     This Court should declare that the "Sell & Stay" transaction between Defendants and Plaintiff is in fact an "equitable" or "disguised" mortgages so

---

[1] This lawsuit brings nearly identical allegations and claims and arises from similar facts and circumstances to Noggle et al. v. EasyKnock, Inc. et al, 24-cv-11638; therefore, it should be considered a companion case. All Defendants are citizens of New York and Plaintiff is domiciled in Michigan; therefore, this is an action brought under the Court's diversity jurisdiction.

[2] *See, e.g., Koenig v. Van Reken*, 89 Mich. App. 102, 106, 279 N.W.2d 590, 592 (1979) (citing *Ellis v. Wayne Real Estate Co.*, 357 Mich. 115, 97 N.W.2d 758 (1959); *McLaughlen v. Majestic Development Corp.*, 247 Mich. 498, 226 N.W. 256 (1929)).

that the legality of the transaction can properly be evaluated under the federal and state laws that safeguard consumers from predatory lending practices.

5.     Our national consumer protection laws for homeowners are set forth in relevant part in the Truth in Lending Act ("TILA"), as amended by the Home Owners Equity Protection Act ("HOEPA"), 15 U.S.C. § 1601, *et seq.* (together, "the Act").

6.     The Act protects consumers from unfair and deceptive mortgage lending practices.

7.     The Act also requires lenders to provide clear and upfront information about borrowing costs, interest rates, and fees.

8.     To further protect the rights of consumers, the Act preserves the right of consumers to file actions in federal court to vindicate their rights under the Act. The Act accomplishes this purpose by expressly prohibiting arbitration for claims relating to residential mortgages.

9.     One of the many critical protections mandated by the Act is the limitation on mortgage loans that charge excessive interest rates or fees.

10.     Another critical aspect of the Act is that it requires lenders to consider an applicant's ability to repay a loan with interest.

11.     Specifically, the Act forbids creditors from engaging in "a pattern or practice of extending credit . . . based on the consumers' collateral without regard to

the consumers' repayment ability, including the consumers' current and expected income, current obligations and employment." 15 U.S.C. § 1639(h).

12. The Federal Reserve Board has the authority to issue regulations to implement TILA, and the Board does so in what is known as Regulation Z, found at 12 C.F.R. Pt. 226. The portion of Regulation Z pertaining to § 1639(h) states the following:

> A creditor extending mortgage credit subject to this section may not ... [e]ngage in a pattern or practice of extending such credit to a consumer based on the consumer's collateral if, considering the consumer's current and expected income, current obligations, and employment status, the consumer will be unable to make the scheduled payments to repay the obligation. 12 C.F.R. § 226.32(e)(1) (1997).

13. In other words, under the Act, if the borrower appears unable to repay the loan, the lender cannot offer the loan.

14. In clear violation of the Act, through its "Sell & Stay" scheme, Defendants have engaged and continue to engage in a pattern and practice of extending credit to homeowners based solely on the amount of equity in their homes, e.g., their collateral, without regard to their repayment ability.

15. This unlawful pattern and practice of lending money to consumers based only on the value of their collateral, and without regard to their ability to repay, is EasyKnock's standard operating procedure and regular practice with respect to the "Sell & Stay" transactions.

16.     This standard operating procedure and regular practice is evidenced by the fact that, through its "Sell & Stay" transactions, EasyKnock boasts that it has become the fifteenth largest owner of single family residential real estate in the United States, that it has purchased thousands of homes in its eight years of operation[3] and, based on research of available public records, EasyKnock has purchased warranty deeds for at least 80 homes in Michigan alone, each of which, under information and belief, was based only on the amount of equity in the borrowers' homes (their collateral) and without regard to the borrowers' ability to repay.

17.     EasyKnock's pattern and practice of extending credit based on the amount of equity in the borrower's home, and not based on their ability to repay, is further established by its own public statements, including the statement on its website that in qualifying for "Sell & Stay" transactions, homeowners "won't face credit score or debt-to-income (DTI) requirements," which are designed and required by law to assist in determining the borrowers' ability to repay loans.[4]

---

[3] https://www.forbes.com/sites/brucerogers/2019/01/07/easyknock-aims-to-simplify-home-equity-finance/ (site last accessed June 14, 2024)
[4] https://www.easyknock.com/programs/sellstay (site last accessed June 14, 2024)

*Zeld v. EasyKnock et al.*, p. 6

18.   EasyKnock states that homeowners can access their home equity, "and avoid the hassle of lender restrictions."[5]

19.   This is simply a way of stating that homeowners can borrow money, using their home equity as collateral, while EasyKnock evades and violates the provisions of the Act requiring it to determine the homeowners' ability to repay before making the loan.

20.   EasyKnock expressly targets homeowners who have significant home equity, which they cannot "access" or "release" because of low income or bad credit.[6]

21.   EasyKnock targets these homeowners because they cannot demonstrate the ability to repay loans even when the source of the funding is their home equity.

22.   The founder and CEO of EasyKnock, Defendant Jarred Kessler, proclaims that by taking home equity away from homeowners, and turning homeowners into renters with extensive fees, costs, and rental obligations to EasyKnock, he is doing homeowners a service and a favor. For example, Kessler has stated:

> "Money is fungible. If your house is your lowest source of capital it will leave consumers a tremendous amount of flexibility," said Kessler. "For the middle class in the United States, if you're not qualified on a traditional lending platform, you're not treated very

---

[5] https://www.facebook.com/EasyKnock/ (site last accessed June 14, 2014)
[6] https://www.forbes.com/sites/brucerogers/2019/01/07/easyknock-aims-to-simplify-home-equity-finance/ (site last accessed June 14, 2024)

well, and I believe this is a real opportunity to roll out the red carpet for the everyman."[7]

23.  According to Kessler, because of the sub-prime lending crisis in the mid-2000's, and the resulting legal regulations and restrictions on sub-prime lending, mortgage lenders are too restricted in their ability to loan money to homeowners who have significant equity in their homes, but who have low income or poor credit scores, and are consequently "stuck" or "shut out of that market" for lending products based on home equity.[8]

24.  Kessler refers to one common measure of a borrower's ability to pay, the FICO score, as the "scarlet letter" that precludes them from qualifying for loans based on their home equity,[9] and states that EasyKnock's "Sell & Stay" product is designed for borrowers who cannot legally qualify for loans because of their debt-to-income ratio.[10]

---

[7] https://www.forbes.com/sites/brucerogers/2019/01/07/easyknock-aims-to-simplify-home-equity-finance/ (site last accessed June 14, 2024)

[8] https://www.youtube.com/watch?v=tq2cqfbxKks (site last accessed June 14, 2024).

[9] https://www.youtube.com/watch?v=tq2cqfbxKks (site last accessed June 14, 2024).

[10] https://www.youtube.com/watch?v=qJttkx2KJRA (site last accessed June 14, 2024)

25.     The legislative history of the Act, as stated in the Senate Report, describes the problem at which the statute is aimed, which is precisely the same as the problem created by EasyKnock's "Sell & Stay" transactions:

> Typically, the homeowners have limited incomes but have developed equity in their homes as a result of paying down their first mortgages, inheritance, or the rise in real estate values in the 1980's. The equity provides security for sizeable second mortgage loans. Because the borrowers have little cash flow, however, they must often struggle to meet overwhelming mortgage payments. In some instances, the struggle culminates in the borrower's loss of his or her home through foreclosure. S.Rep. No. 103–169, at 22 (1994), reprinted in 1994 U.S.C.C.A.N. 1881, 1906.

26.     EasyKnock preys on homeowners who are in financial distress with bad credit but have substantial home equity, by promising an easy, no-credit-check way to "release the equity in their home."

27.     EasyKnock preys on these distressed homeowners by deceiving them into what it calls a "Sell & Stay" transaction.

28.     Each "Sell & Stay" transaction involves the following three interrelated documents:

a.  A Purchase Agreement pursuant to which EasyKnock purchases the homeowner's home;

b.  A Lease Agreement pursuant to which EasyKnock leases the home back to the homeowner for one year, renewable by the homeowner for a maximum term of 5 years.

    c.  An Option Agreement granting the homeowner an option for up to 5 years to repurchase the home or have it sold to a third party.

29.    Each EasyKnock Purchase Agreement states as the Purchase Price an amount that approximates fair market value of the home. But EasyKnock deducted from this amount an Option Agreement Fee of 25% of the Purchase Price for Zeld's home and a "Processing Fee" of 5% of the Purchase Price, with the result that the amount advanced by EasyKnock is in fact 70% or less of the Purchase Price.

30.    Christine Zeld's EasyKnock Lease:

    a.  provided for an initial annual rent of approximately 13% of the funds advanced by EasyKnock, even accounting for real property taxes paid by EasyKnock on the home.

    b.  provided that the initial annual rent increases each lease year by the greater of 2.5% or changes in the Consumer Price Index. Indeed, she has been advised that her rent will increase by 3.4% in August of 2024.

    c.  set Zeld's Option Exercise Price at the stated Purchase Price, $178,000, less the Option Agreement Price of $44,500.  To exercise the OptionZeld must pay EasyKnock the Option Agreement Price plus any costs incurred by EasyKnock and any other amounts owing to EasyKnock.

d.  Imposed an annual additional option fee, starting at 5% of the option exercise price, and totaling $22,695 (16% of the original option exercise price) over five years for Zeld to repurchase her home.

31. EasyKnock's agents and representatives, assured Zeld, a financially distressed homeowner, that she will be able to keep her home and merely "unlock the equity" in it.

32. To a financially distressed homeowner like Zeld, EasyKnock's "Sell & Stay" transaction sounds like a home mortgage loan that avoids the need for a credit check by temporarily transferring the deed to her home to EasyKnock as collateral.

33. EasyKnock's "Sell & Stay" transaction does not just sound like a home mortgage loan. In fact, it substantively is a home mortgage loan that illegally advances cash based on the borrower's home equity as collateral without conducting a credit check, evaluating whether the homeowner has the ability to repay the loan, or providing clear disclosures upfront about the costs of the loan.

34. Substantively, the elements of a residential mortgage loan and an EasyKnock "Sell & Stay" transaction are identical.

35. The elements of a **residential mortgage loan** are as follows:

a.  Lender advances the homeowner money.

b.  Lender pays itself a processing fee and third-party costs such as inspection and title insurance costs.

c.  Homeowner gives Lender a mortgage on the house as security for the payment of the amount owed to Lender.

d.  Homeowner pays Lender monthly payments including funds to pay taxes and the cost of insurance on the home.

e.  Homeowner pays Lender the amount owed to it, and the security interest in the home is released.

f.  If homeowner fails to pay the amount owing to Lender, Lender may force the sale of the house, and evict the homeowner.

g.  If Lender forces the sale of the house after the homeowner defaults, Lender gets from the sale of the home the amount owing to it, and the homeowner gets the balance.

36.  The elements of an **EasyKnock "Sell & Stay" transaction** are substantively the same, as follows:

a.  EasyKnock advances the homeowner money.

b.  EasyKnock pays itself a processing fee and third-party costs such as inspection and title insurance costs.

c.  Homeowner gives EasyKnock a deed to the home as security for the payment of the amount owed to EasyKnock.

d. Homeowner pays EasyKnock monthly payments including funds to pay taxes and the cost of insurance on the home.

e. Homeowner pays EasyKnock the amount owed to it, and EasyKnock deeds the home back to the homeowner.

f. If homeowner fails to pay the amount owing to EasyKnock, EasyKnock may force the sale of the house, and evict the homeowner.

g. If EasyKnock forces the sale of the home after the homeowner defaults, EasyKnock gets from the sale of the home the amount owing to it, and the homeowner gets the balance.

37. Thus, the only differences between a residential mortgage loan and a "Sell & Stay" transaction are cosmetic, not substantive: i.e.,

a. where a typical mortgage uses the term "monthly payment," the "Sell & Stay" uses the term "rent";

b. where a typical mortgage uses the term "loan amount," the "Sell & Stay" transaction uses the term "purchase price less option agreement"; and

c. where a typical mortgage uses the term "mortgage," the "Sell & Stay" transaction uses the term "deed."

38. To induce Zeld to enter into this transaction, Defendants' agents and employees, including Chun Kai Chang ("CK"), assured and promised Zeld

that her life was going to be "great" when she got the funds from the transaction to pay off her debts.

39.   At no time prior to entering into the "Sell & Stay" transaction did EasyKnock explain to Zeld that $44,500 of the home purchase price on her condominium would be deducted as an "option agreement" and that she would pay a substantial annual option fee for the continued right to exercise the option.

40.   EasyKnock did not explain to Zeld what the significant deductions were to the transaction, either.

41.   EasyKnock's "Sell & Stay" transaction grants EasyKnock the right to evict Plaintiff from her home if they default on the Lease—a result that is nearly guaranteed to happen given Plaintiff'' financial distress.

42.   Plaintiff has fallen behind on her "rent" payments to EasyKnock and is now at risk of eviction from her home.

43.   Here, EasyKnock purchased Plaintiff's home for a purchase price 25% below market value in a transaction that took advantage of her financial distress and imposed unconscionable fees on her both through the initial transaction and through ongoing "rent" payments and "option fees."

44.   Recognized as a disguised or equitable mortgage, Zeld's so-called "Sell & Stay" transaction with EasyKnock is unlawful under both state and federal law:

a. it violates the Michigan usury laws and the Michigan Consumer Protection Act;

b. fails to provide the proper disclosures and violates key statutory requirements of the federal Truth in Lending Act, including the requirement for basing lending decision on the consumer's ability to repay, and not merely the value of their collateral; and

c. fails to comply with the disclosure and key statutory requirements of the federal Home Ownership and Equity Protection Act when charging a high rate of interest (in the form of the fees and costs on the transaction and the ongoing rents and late fees) to Plaintiff.

45. Plaintiff files this action for declaratory relief and damages.

a. First, Plaintiff seeks a declaration that Defendants' "Sell & Stay" agreements is a disguised/equitable mortgage under Michigan law.

b. Second, Plaintiff seeks a declaration that the matters alleged in this action are not subject to arbitration. Plaintiff's "Sell & Stay" transaction contains arbitration provisions, but such provisions are void because they violate state and federal prohibitions of arbitration, are procedurally and substantively unconscionable, and deny a homeowner or renter the right to a jury trial. Therefore, these arbitration provisions are contrary to public policy and null and void on their face.

    c.  Third, Plaintiff seeks damages and other relief in the form of: actual losses and statutory damages, plus an award of attorney fees and costs, and all other relief, legal and equitable, that is necessary to redress the violations of law alleged in this action.

46.   Plaintiff files concurrently with this action a Motion for a Temporary Restraining Order and Preliminary Injunction to prevent irreparable harm by

    a.  enjoining Defendants from evicting her from her home during the pendency of this action;

    b.  allowing Plaintiff to continue living in her home while this action is pending;

    c.  declaring the "Sell & Stay" transaction to be an equitable mortgage; and

    d.  declaring that Plaintiff's claims in this matter are not arbitrable.

## PARTIES, JURISDICTION, AND VENUE

47.   Plaintiff Christine Zeld is a single woman living in Allen Park, Michigan and she is domiciled in the Eastern District of Michigan.

48.   Defendant EasyKnock, Inc. is incorporated in Delaware with its principal place of business at 111 W. 33rd Street, Suite 1901, New York, New York 10120.

49.   Defendant EK Real Estate Fund 1, LLC is a limited liability company established in Delaware and with its principal place of business at 111 W. 33rd

Street, Suite 1901, New York, New York, 10120. The sole member of this LLC is Defendant EasyKnock, Inc, which is an entity organized in Delaware with its principal place of business in New York.

50. This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this action is brought between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

51. Pursuant to 28 U.S.C. § 1331, this court also has jurisdiction over the federal claims brought in this action because those claims arise under federal law.

52. At all times relevant to this lawsuit, Defendants purposefully availed themselves of the business and economic opportunities within the State of Michigan and carried on continuous and systematic parts of their business in Michigan. Defendants own, use and possess property, including the real estate involved in their transactions with Plaintiff within Michigan, have entered into contracts to perform services in Michigan, and have contributed to and committed the unlawful acts alleged in this Complaint in Michigan. This Court can therefore exercise personal jurisdiction over all Defendants.

53. All events, incidents, and circumstances relevant to this lawsuit took place in the Eastern District of Michigan; therefore, venue is proper in this district.

## FACT ALLEGATIONS

## EasyKnock's "Sell & Stay" Transaction is an Equitable Mortgage

54.  Lenders may not avoid the legal consequences of their actions by disguising mortgage transactions as something else.

55.  It is well-settled law in Michigan "that the adverse financial condition of the grantor, coupled with the inadequacy of the purchase price for the property, is sufficient to establish a deed absolute on its face to be a mortgage." *Koenig v. Van Reken*, 89 Mich. App. 102, 106, 279 N.W.2d 590, 592 (1979) (citing *Ellis v. Wayne Real Estate Co.*, 357 Mich. 115, 97 N.W.2d 758 (1959); *McLaughlen v. Majestic Development Corp.*, 247 Mich. 498, 226 N.W. 256 (1929)). When a transaction meets these conditions, Plaintiff is entitled to have the deed sale of her home declared to be an equitable mortgage.

56.  EasyKnock designed and represented its "Sell & Stay" transaction to Plaintiff as a loan using her home as collateral, with all the features of a mortgage.

57.  Defendant EasyKnock boasts that it is at least the fifteenth largest owner of single-family residential housing in the United States, represents that it has a valuation of between $500 million and $1 billion, and acquired at least 800 single-family homes in 2023 alone.

58.  By contrast, Plaintiff is an individual in significant financial distress with a high debt-to-income ratio, low credit scores, and no capacity to pay the "rent" or exercise her "option" to regain title to their home.

59.    By withholding 25% of the "purchase price" of Plaintiff's home as the "option agreement" price and further extracting processing fees and transaction costs from Plaintiff, Defendants purchased Plaintiff's home for the inadequate price of less than 70% of its market value.

60.    EasyKnock's "Sell & Stay" transaction should therefore be declared an equitable mortgage and treated as a residential home mortgage for all purposes of this lawsuit.

### EasyKnock's "Sell & Stay" Transaction Contains Oppressive Terms and Defendants Induce Customers through Fraud

#### *EasyKnock Only Considered Plaintiff's Equity in her Home*

61.    EasyKnock and its agents and employees, prominently promises that they do not conduct a credit review or evaluate potential customers' debt-to-income ratios—as federal laws require for home mortgage loans.

62.    Plaintiff was in severe financial distress at the time she reached out to EasyKnock to learn more about the "Sell & Stay" transaction.

63.    As part of the process to "qualify" for EasyKnock's "assistance," Plaintiff was required to provide EasyKnock with:

a.  Government-issued ID;

b.  Recent bank statement;

c.  Recent pay stubs;

d.  Other income documentation, and

e.  Her most recent gas, water, and electric bills.

64.   This information was not used to determine Plaintiff's ability to repay, but instead demonstrated that she would not, in fact, be able to keep up with the payment of rent and fees needed to actually exercise the repurchase option, the value of which EasyKnock knew to be illusory.

65.   Through this application process, Plaintiff fully disclosed to EasyKnock's representatives that she was under considerable financial distress, with debt well beyond her capacity to repay or service.

66.   EasyKnock conducted an appraisal of Plaintiff's home and required documentation of Plaintiff's equity in her home.

67.   In a traditional mortgage or home-equity-loan transaction, the lender requires financial documentation to prepare a valuation and loan terms to the borrower.

68.   By contrast, in a traditional home sale without a mortgage, there is no need for the sellers to provide information about their income and debt.

69.   Before EasyKnock engaged in the "Sell & Stay" transaction with Plaintiff, Defendant already knew enough about her income and debt to know that her debt-to-income ratio was so high that she could not afford to pay off the terms of the transaction—the "rent" and options fees—to regain title to her home.

70.   Based on Plaintiff's disclosures of her considerable financial distress through their high debts and relatively low income, EasyKnock and its agents

understood that Plaintiff was not capable of paying the monthly "rent" that would be charged after the transaction.

71.    Prior to executing the "Sell & Stay" transaction with Plaintiff, EasyKnock knew that she did not have the financial capacity to repurchase her home within the 5-year option period.

72.    Prior to executing the "Sell & Stay" transaction with Plaintiff, EasyKnock knew she did not have the financial capacity to restore her credit ratings and acquire the mortgage loan that would be necessary to repurchase her homes from EasyKnock.

### EasyKnock Fraudulently Induced Plaintiff into its "Sell & Stay" Transaction and Unjustly Enriched itself through this Asymmetrical Transaction

73.     EasyKnock's "Sell & Stay" transaction involves three contractual agreements between Plaintiff and EasyKnock:

   a.  Residential Real Estate Sales Agreement ("Purchase Agreement");

   b.  Residential Lease Agreement ("Lease"), and

   c.  Residential Real Estate Option Agreement ("Option Agreement").

74.    All of these contracts were drafted by EasyKnock and Plaintiff had no opportunity to negotiate the terms of the transaction.

75.    Throughout the entire transaction, starting with its website content targeting Plaintiff as well as their direct engagements with Plaintiff, Defendants knew that within 5 years this distressed homeowner would not be able to repair her

credit rating and get out from under her financial distress, or qualify for a conventional mortgage loan to exercise her option to repurchase her home.

76. The "option" that EasyKnock granted at the time of the sale, and for which EasyKnock charged Plaintiff 25% of the purchase price, is an illusory promise to this distressed former homeowner, because EasyKnock knows that Plaintiff has no realistic possibility of repurchasing her home.

77. According to the terms of the "Sell & Stay" transaction, when Plaintiff defaults on the Lease, EasyKnock immediately gains the right to sell the home at its own discretion—including for a "fire sale" price that wipes away Plaintiff's remaining option value in the home.

78. EasyKnock also:

a. added over $9,000 in fees to the home sale transaction,

b. charges the now-former homeowner a monthly rent equal to over 10% of the home's value (an amount that Defendants know the Zeld cannot afford),

c. raises that rent by at least 2.5% annually—3.4% starting on August 1, 2024,

d. imposes hundreds of dollars in late fees on Zeld when she, predictably, has not been able to make rent payments on time, and

e. assesses an "option" fee (or increases the option exercise price) each year to maintain the illusion that one day she can buy back her home.

79.    EasyKnock knew before it entered into its "Sell & Stay" transaction with Plaintiff that she was in significant financial distress and would not be able to afford the "rent" EasyKnock would charge her to keep living in her home, but nonetheless entered into the transaction only with a view to her equity in their homes, and without regard to her ability or inability to repay.

80.    The "Sell & Stay" transaction comprises 50 pages, all prepared by EasyKnock.

81.    EasyKnock did not provide Plaintiff with paper copies of these agreements.

82.    Instead, Plaintiff completed the entire transaction by reviewing and signing these agreement on her smart phones, which is adequate for reviewing a contract for the sale of one's home.

83.    As part of the "Sell & Stay" Transaction, Plaintiff initialed and signed a document acknowledging that she knew they were selling their home to EasyKnock.

84.    However, through conversations with EasyKnock's agents, including CK, Plaintiff was led to understand that this transfer of the title of her home was necessary because the equity in her home was serving as collateral for the loan.

85.   In Plaintiff's understanding, the entire "Sell & Stay" transaction was a temporary transfer of her home title to EasyKnock until she was ready to exercise the option to reclaim her home.

86.   Defendants' purchase of Plaintiff's home through the "Sell & Stay" transaction imposed unfair, unlawful and unreasonable costs on Plaintiff, including:

    a.   In Michigan, sellers ordinarily only pay half the document preparation fees, but in their transactions with Defendants, Plaintiff was assessed all the fees on the transactions,

    b.   Furthermore, had the "Sell & Stay" transaction been properly documented as a mortgage, Plaintiff would not have been assessed real estate transfer taxes,

    c.   Plaintiff incurred additional economic injury because the documentation of a sale of her home, rather than a mortgage loan, uncapped the property's real estate assessment, which has resulted in higher annual real estate taxes that are passed on to Plaintiff through increased "rent" and will be imposed directly on the Plaintiff when she regains title to her home.

***EasyKnock's Lease Agreement is Intended to Trigger a Default; Predictably,
Plaintiff is Past-Due on her Account and faces Imminent Eviction***

87.    Under the Lease Agreement portion of the "Sell & Stay" transaction, Plaintiff
       agreed to lease jer home from EasyKnock for a one-year term, with an
       automatic renewal for a maximum of five one-year lease terms.

88.    EasyKnock's Lease Agreement, which is incorporated into the "Sell & Stay"
       transaction, terminates at the end of five years or earlier if triggered (1) by a
       likely tenant default and eviction or (2) by the unlikely execution of the Option
       Agreement.

89.    EasyKnock's Lease Agreement includes a mandatory arbitration provision
       that is contrary to Michigan's Truth in Leasing Act, MCL 554.633(1)(f), which
       prohibits any lease provision that "[w]aives or alters a party's right to demand
       a trial by jury. . . ."

90.    In each subsequent year of the lease, the rent would increase by the greater of
       2.5% or the increase in the "Consumer Price Index for all Urban Consumers"
       published by the U.S. Department of Labor.

91.    Since 2021, the CPI has increased by more than 2.5% each year.

92.    The Lease Agreement established a late fee for rent not received by the end of
       the 5th day of the month. This fee is set at the greater of 5% or $100 of the
       rent. For Zeld, this late fee is currently $94.90.

93.   If a tenant-Plaintiff "fails to timely pay all amounts due" under the Lease Agreement "or otherwise fails to comply with its obligations under this Lease Agreement (whether or not specified as triggering an Event of Default)", EasyKnock may declare a default.

94.   If EasyKnock exercises this right to declare a default of the Lease, it may initiate eviction of the tenant under the laws of the Michigan, demand all unpaid rents, and hold the tenant-Plaintiff liable for any lost rent and EasyKnock's costs, including attorney's fees and court costs for eviction.

95.   Plaintiff has been unable to pay her rent and has been assessed late fees.

96.   Plaintiff is behind on her "rent" payments and has reason to believe from the threats and harassing collections calls from Defendants and their agents and representatives that she faces imminent eviction proceedings.

### *EasyKnock's Option Agreement is an Illusory Promise that Functions as an Integral Part of the Equitable Mortgage*

97.   EasyKnock's "Sell & Stay" transaction grants Plaintiff, now a former homeowner, the option to repurchase her home from EasyKnock within 5 years.

98.   The initial right to this option cost Plaintiff an "Option Agreement" fee of $44,500 deducted from the purchase proceeds as follows:

99.   This option requires the Plaintiff to continue to lease the home at an "rent" of $1,898 set by EasyKnock for up to five years, and also requires additional option fees that accrue annually in addition to the option exercise price or.

100.  Plaintiff's option exercise price started at $133,500, which is the initial purchase price of $178,000, less the option agreement value of $44,500.

101.  Viewed as a disguised, or equitable mortgage, the initial value or principal of the disguised mortgage loan is the purchase price of the home less the "option agreement" value retained by EasyKnock.

102.  Thus, the principal loan amounts for Plaintiff, once the "Sell & Stay" is deemed and equitable mortgage, is $133,500.

103.  To exercise their option agreements, Plaintiff must also pay the following fees to EasyKnock:

Year 1: (5% of the principal or option exercise price): $6,675

Year 2: (4%) $5,340

Year 3: (3.3%) $4,450

Year 4: (2.7%) $3,560

Year 5: (2%) $2,670

104.  The Option Agreement is intergrally tied to the Lease Agreement because it states: "Lease Agreement Obligations. The payment and performance in full

of all obligations of the tenants under the Lease Agreement, including the payment of all past due rent, shall be an express condition to Option."

105. Thus, the annual option fees imposed on Plaintiff is properly viewed as additional interest on the equitable or disguised mortgage loan.

106. The Option Agreement also includes a third-party purchase clause, whereby EasyKnock would only be entitled to the option exercise prices plus their fees and costs of the transaction such as option fees past-due rents, real estate broker transactions, and title charges, while Plaintiff would receive any remainder in the sale transaction.

107. A conventional mortgage lender retains similar rights to EasyKnock's rights in its "Sell & Stay" transraction when a property is sold: the mortgage lender is entitled to the principal amount advanced plus interest and fees, while the risk of a lower sale value or benefit of a higher sale price goes to the borrower.

108. Properly viewed as a disguised/equitable mortgage, the "Sell & Stay" transaction yields the same result whether Plaintiff exercises her option to "repurchase" her home or opts to sell it to a third-party: Defendants are only entitled to repayment of the principal loan amount plus fees and cost, while the remaining proceeds go to Plaintiff.

109. Viewed as an equitable mortgage loan, the "Sell & Stay" option for Plaintiff to regain title to her home requires the following charges, which are, in actuality, interest payments:

    a.  all rent which Plaintiff is required to pay, less real property taxes, casualty insurance and home owners association fees paid by Easy Knock,

    b.  the Option Fees or annual increases to the option exercise prices as set forth in ¶ 103, and

    c.  all other amounts in excess of the Purchase Price less Option Agreement Fee (i.e., the principal loan amount as set forth in ¶ 102) to regain title to her former home.

110. Since the "rent" paid to EasyKnock on the Lease Agreement is also required to exercise the option, yet it does not get applied to the principal of the disguised mortgage loan, the "rent" in actuality is a monthly interest-only payment on the disguised mortgage loan.

111. Thus, Plaintiff will each have been assessed the following fees and costs that are properly construed as interest on the principal loan amount if they were to exercise their option to regain title to their homes at the time of this filing: $22,475 over 11 months is an APR of 18.4% on the principal loan, and upfront "points" of $9,429.70 is 7% of the $133,500 principal.

     i.     Rent: 11 months of $20,800, less estimated taxes, insurance and condo fees of $5,000, and Option Fee: 1 years $6,675.

     ii.     Upfront costs of Processing Fees for "Sale": $8,882.20 and Half the Document Charges for "Sale": $547.50

112.    In the likely event that Plaintiff defaults on the Lease, EasyKnock may evict her and sell the property on terms of its sole discretion without Plaintiff having the protections available to borrowers in conventional mortgage loans.

113.    Since failure to pay rent can trigger a default under the Lease Agreement, and Plaintiff is behind on payments, Plaintiff faces an imminent threat of eviction from her home.

***EasyKnock Engages in Deceptive and Unfair Consumer Practices Designed to Ensnare Unsophisticated, Financially Distressed Homeowners in a Transaction that Causes them to Lose their Homes***

114.    When Christine Zeld needed cash and realized that she could not qualify for a typical loan based on her home's equity, EasyKnock popped up high in her internet search results with links titled: "Alternative to Bad Credit Loan— EasyKnock Home Equity Release," and promising a "flexible alternative to a HELOC."[11]

---

[11] Google search result for "need an equity loan on my house and I have bad credit" and landing page for EasyKnock, https://qualify.easyknock.com/home-solutions?utm_source=adwords&utm_medium=ppc&utm_campaign=LQ-SellandStay-Bad-Credit-Loan-Underperformers&utm_term=Home%20equity%20loans%20for%20people%20wi

115.  EasyKnock's website deliberately compares its "Sell & Stay" transaction to a Home Equity Line of Credit ("HELOC") explaining that its "home equity solutions" to "Get Cash in Three Easy Steps" benefit homeowners with bad credit in the following ways:

d.  "Avoid credit score or DTI [debt to income] requirements

e.  "Future home maintenance expenses covered"

f.  "Avoid rising interest rates"

g.  "One monthly payment – no taxes or HOA [homeowners association]

116.  Despite this marketing language that deliberately uses home equity loans as a way to explain it's products to potential customers, EasyKnock is not a licensed lender or financial institution in the State of Michigan, nor it is licensed as a brokerage for residential home sales in the State of Michigan.

117.  In the small-print disclosure at the bottom of this webpage for EasyKnock's home solutions, which distressed homeowners with bad credit find by searching for home equity loans for people with bad credit, EasyKnock states that it and its affiliates and subsidiaries "are not lenders and do not provide loans."

---

th%20bad%20credit&utm_content=SellandStay&campaign_id=11693039206&ad group_id=116602990034&keyword_id=kwd-26586183&ad_id=662922491996&gclid=CjwKCAjwi_exBhA8EiwA_kU1Mu1vv umkBuBikXu3mFkgLjBhGh1tVVaG4cZahUPtbYve5Eq-7qgtLBoCnOgQAvD_BwE (last visited May 10, 2024).

118.    EasyKnock, on its home webpage, www.easyknock.com, promises, "It's your home equity. Make it work for you. Get the cash you need to pursue your financial goals with EasyKnock's innovative residential sale-leaseback solutions, an alternative to home equity loans."[12]

119.    EasyKnock further promises at www.easyknock.com (last visited May 10, 2024):

   a.   "Forget Credit Score or DTI Requirements. No two homeowners are the same. Credit Scores and debt-to-income (DTI) ratios don't' hold you back with EasyKnock's solutions.

   b.   "EasyKnock is Flexible. Whether your goals are short-term or long-term, EasyKnock programs can help address your needs."

   c.   "Retain Appreciation. In contrast to a traditional home sale, an EasyKnock solution lets you maintain the rights to any home value appreciation."

120.    This last selling point specifically describes the "Sell & Stay" transaction as comparable to a mortgage loan, where the homeowner would maintain the rights to any home value appreciation.

121.    EasyKnock's "Sell & Stay" transaction is a sale of the home for "up to 75% of the home's fair market value" in cash and at least 25% of the sale conveyed

---

[12] EasyKnock, www.easyknock.com, (last visited May 10, 2024).

as an illusory option towards the repurchase of the house, combined with a lease, renewable each year for up to five years total.[13]

122. EasyKnock represented and Plaintiff understood the "Sell & Stay" transaction to be loan-like, since she would use the equity in her home as collateral for a loan, and she would have her home returned to her when she had completed five years of monthly payments.

123. At all times relevant to this matter, Jarred Kessler has served as the CEO and leaders of EasyKnock and its subsidiaries and related entities.

124. At all times relevant to this matter and in his capacity as EasyKnock CEO, Jarred Kessler has made extensive statements that deliberately deceive consumers and have directly induced and caused Plaintiff to engage in Defendants' "Sell & Stay" transaction.

125. Defendant Kessler has made the following public statements and admissions[14] about the "Sell & Stay" transaction that are deceptive:

126. "Number one, we help people stay in their home." This statement is deceptive because under information and believe at least 4 of every 5 homeowners who enter into the "Sell & Stay" transaction with EasyKnock ultimately cannot

---

[13] EasyKnock Programs, "Sell & Stay" program details, https://www.easyknock.com/programs (last visited May 10, 2024).
[14] All statements are taken from "Fireside with a VC", available at https://www.listennotes.com/de/podcasts/fireside-with-a-vc-episode-89-jarred-kessler-x8-6Wj30E9o/ (last visited June 19, 2024).

afford the transaction and must leave their homes before the end of the five-year transaction.

127.   He likened the FICO score the "scarlet letter" for homeowners and stated that EasyKnock does not consider a homeowner's FICO score and their ability to repay a loan, but only considers their home equity when evaluating them as a customer for the "Sell & Stay" transaction. This statement serves as an admission that EasyKnock violates the Truth in Lending Act by ignoring the FICO score, which is an essential indicator of a consumer's ability to make payments on a debt, when engaging in a transaction secured by the consumer's home.

128.   "The person will always receive in our transaction, all the upside, where they can buy it back." This statement serves as evidence that the "Sell & Stay" transaction functions like a disguised mortgage, because the lender (here, EasyKnock) is only entitled to the principal, interest and costs, while the borrower (here, Plaintiff) is entitled to any upside in the value of the home when they repay the mortgage.

129.   "We've only had to evict eight people out of over thousands of homes that we've bought." This statement serves as evidence that EasyKnock owns thousands of family homes. This statement is also deceptive and untrue, as

under information and belief, EasyKnock has evicted 10 families in Michigan alone.

### Allegations Specific to Plaintiff

130. Christine Zeld is a 73-year-old woman who lives in a condominium at 26 Parkplace Central, Allen Park, Michigan 48101 in the County of Wayne, Michigan.

131. Zeld acquired her home on Parkplace Central in 1998 for $130,000.

132. In July of 2023, Zeld had a first mortgage for almost $78,000 on the home and a second mortgage of nearly $9,000.

133. Zeld is a musician and before the 2020 COVID lock downs, she earned her living by teaching private students and playing at events like weddings, funerals and other private functions.

134. She also earned income by teaching English as a second language to international businesspeople working in the United States.

135. After 2020, Zeld's financial situation became desperate for two reasons: with the onset of the COVID lockdowns, her income from playing music at events and giving music lessons diminished.

136. Second, Mrs. Zeld incurred substantial medical and credit card debt paying for her critically ill mother's medical treatment and then for her funeral.

137.   Zeld sought to cure her financial distress by securing a second home equity line of credit; however, her debt-to-income ratio was too high and her credit score was too low. She was rejected by Rocket Mortgage and other options she tried.

138.   In addition to her home mortgage loans, Zeld had credit card debt of over $40,000 and car payments of $600 per month.

139.   In 2023 Zeld fell months behind on her credit card and medical debts and became increasingly desperate as collections representatives harassed her for payments.

140.   Around May or June of 2023, Zeld found EasyKnock online as an alternative to the home equity loans she was denied.

141.   On July 22, 2023, Zeld, as Trustee of her Revocable Living Trust, entered into a "Sell & Stay" transaction with Defendant EK Real Estate I, LLC.

142.   During her conversations with EasyKnock's representatives, including Chunkai Chang ("CK"), Zeld was repeatedly assured that EasyKnock would "solve all her problems for her."

143.   CK further assured Zeld that that she would be out of debt and that her credit score would jump at least 40 points once she finalized the "Sell & Stay" transaction.

144. CK also assured her that EasyKnock would take care of all repairs, by telling her that when it came to home repairs, "everything is covered".

145. Before July 22, 2023, Zeld began to express concerns about the "Sell & Stay" transaction—particularly, because she found some of the answers to her questions vague, evasive and not truthful.

146. In response to Zeld's concerns, CK warned her that she would "regret it" if she did not go through with the transaction.

147. On one day close to the July 22, 2023 closing date, when Mrs. Zeld told CK that she was thinking of not closing, CK told her she had to close immediately or EasyKnock would walk away.

148. The "Sell & Stay" transaction was executed on July 22, 2023, with the Parkplace Home purchased by Defendants for $178,000, which was approximately $5,000 less than its market value.

149. The HUD(1) Seller's Closing Statement also lays out the following debits against Zeld:

    a. $44,500 for the "option agreement," which means that Defendants retained 25% of the purchase price of the home.

    b. $8,882.20 for a "processing fee," which is 5% of the purchase price, or 6.65% of the actual proceeds of the house.

    c. $5,000 for a "repair fund."

d. $612.26 for "July rent" from 7/22/2021 to 8/1/2023.

e. As part of this closing on the Parkplace Home, proceeds from the settlement paid of the First Mortgage Loan of $77,797.64 and a second mortgage to Wells Fargo for $8,996.99.

150. Zeld's proceeds were also used to pay the following "Title Charges":

a. $545.55 for the Lender's title insurance on the first mortgage;

b. $1,199 for the owner's title insurance;

c. $150 for the title search;

d. $70 for document preparation;

e. $125 for notary fees;

f. $750 as a "settlement or closing fee" to the title company.

151. Additional charges to the proceeds for the sale were:

a. $319, ostensibly to pay off a DTE energy bill

b. $500 in escrow for a final water bill

c. $ 155 in a "Post Closing Account set up fee to KS Management," which is the condominium association's management company and a cost to the new owner of the Parkplace Home, EasyKnock;

d. $80 in a "unit compliance inspection fee to KS Management," which is also a costs to the new owner of the Parkplace Home, EasyKnock;

e. $285 for the July Condominium Association fee;

f.  $709.66 for inspection of the Parkplace Home—another fee that should be paid by the  purchaser, not the seller;

g.  $2,349.64 payment of August Taxes to Wayne County.

152.  After all these deductions, Zeld received $24,719.78 in cash.

153.  The initial "rent" under this is $1,898, which is $22,776 annually and the "rent" will increase each year by the greater of 2.5% or the consumer price index.

154.  She has been advised by Defendants that starting August 1, 2024, her rent will increase by 3.4%.

155.  The Lease allows EasyKnock to charge late fees of $94.90 each month, and so far Zeld has not been assessed this fee on six occasions because she has not been able to pay her "rent" on time.

156.  As of the filing of this complaint, Zeld owes Defendants $4,203.70 in past-due "rent" and late fees.

157.  Estimating $5,000 annually for real estate taxes, homeowners insurance and condominium fees, EasyKnock will have assessed Zeld approximately $17,776 in "rent" net these costs for her first year under the "Sell & Stay" transaction.

158. EasyKnock promised Zeld that all repairs would be "taken care of" under the "Sell & Stay" transaction, but in fact, Defendants withheld $5,000 for a "repair fund" in the closing.

159. When Zeld has tried to get repairs made to the Parkplace Home, Defendants delayed in authorizing repairs and required Zeld to make these repairs out of her own pocket, including a refrigerator repair of $400 and repairs to her heating and cooling system of $296.95.

160. Under typical residential leases in Michigan, the landlord owns and pays for repairs to major appliances like refrigerators and essential home systems like heating and cooling.

161. The Option Agreement that is part of Zeld's "Sell & Stay" transaction with Defendants subordinates Zeld's option value of $44,500 to any and all other liens and mortgages Defendants may enter into on the Parkplace Home.

162. On the same day, July 26, 2023, when Defendants recorded their warranty deed purchase of the Parkplace Home from Zeld, they also recorded a mortgage loan from TVC Funding II LLC in the amount of $133,500.

163. Therefore, Defendants immediately diluted the value of Zeld's "option value" by imposing a more senior lien against the Parkplace Home.

164. The $24,720 cash that she received at the "Sell & Stay" closing was less than half of her credit card and medical debt.

165. After Zeld paid off her mortgage loans through the "Sell & Stay" closing, her credit score did not rise as EasyKnock promised. Rather, it fell.

166. EasyKnock also lied about home repairs: with one exception, EasyKnock has refused to make repairs needed at the Parkplace Home.

167. Prior to closing, Zeld had no knowledge that she would be required to make a substantial annual Option Payment—beyond the $44,500 retained by EasyKnock as the "option value" in order to exercise her option and regain title to her home. The documents provided in advance of closing left the options fees information blank.

168. On December 27, 2023, Zeld filed a petition for bankruptcy in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 23-51257.

169. On June 29, 2024, the Hon. Lisa Gretchko issued an order confirming the Chapter 13 Plan ("Plan"). Doc. 42, 23-51257-lsg.

170. Defendants, through their Senior Director of Collections, Brooke Littva, acknowledged their receipt of notice of this proposed Plan on March 19, 2024.

171. The Plan, in relevant part, states:

> To the extent that the contract between debtor and EasyKnock Real estate fund I,LLC or its assignee or any other related EK company, including Easy Knock is determined to be a hidden/disguised mortgage claim, a violation of Michigan usary laws, a violation of any federal consumer protection laws, Federal and State Truth and lending laws or any other claim that can be brought against EK Real Estate

Fund I LLC, debtor's rights to pursue same are not barred by judicial estoppel or res judicata and debtor's rights to pursue same are preserved and shall survive the discharge of this case. Debtor preserves the right to bring the in State or Federal Court or by arbitration.

172. Zeld has filed an application for non-bankruptcy counsel, as allowed for by this Plan, to bring this civil lawsuit against EasyKnock.

173. Thus, Plaintiff's claims are properly before this Court.

## COUNT I: DECLARATORY ACTION FOR AN EQUITABLE MORTGAGE

174. Plaintiff incorporates all the above allegations by reference here.

175. Michigan courts recognize equitable mortgages. *Eastbrook Homes, Inc. v. Dep't of Treasury*, 296 Mich. App. 336, 351, 820 N.W.2d 242 (2012); *Taines v. Munson*, 19 Mich. App. 29, 36, 172 N.W.2d 217 (1969).

176. Michigan has a long-standing principle that allows courts to intervene with a creditor on behalf of a debtor "to prevent oppression." *Ferd L. Alpert Indus., Inc. v. Oakland Metal Stamping Co.*, 379 Mich. 272, 278, 150 N.W.2d 765, 768 (1967) (citing cases).

177. Lenders may not avoid the legal consequences of their actions by disguising mortgage transactions as something else. This is because it is well-settled law in Michigan that courts may "establish a deed absolute on its face to be a mortgage" when the "adverse financial condition of the grantor" is coupled "with the inadequacy of the purchase price for the property." *Koenig v. Van*

*Reken*, 89 Mich. App. 102, 106, 279 N.W.2d 590, 592 (1979) (citing *Ellis v. Wayne Real Estate Co.*, 357 Mich. 115, 97 N.W.2d 758 (1959); *McLaughlen v. Majestic Development Corp.*, 247 Mich. 498, 226 N.W. 256 (1929)). *See also, Moore v. Cycon Enterprises, Inc.*, No. 1:04 CV 800, 2006 WL 2375477, at *10 (W.D. Mich. Aug. 16, 2006) (citing *Grant v. Van Reken*, 71 Mich. App. 121, 127, 246 N.W.2d 348, 350-51 (1976)).

178.   Courts evaluating whether to impose an equitable or disguised mortgage on a transfer of deed to residential property look to the "intention of the parties" as the controlling factor. *Koenig*, 89 Mich. App. at 106 (citing cases).

179.   When a transaction meets these conditions, Plaintiff is entitled to have the deed sale of their home declared to be an equitable mortgage.

180.   EasyKnock designed and represented its "Sell & Stay" transaction to Plaintiff as a loan using her home as collateral, with all the features of a mortgage.

181.   Defendant EasyKnock boasts that it is at least the fifteenth largest owner of single-family residential housing in the United States, represents that it has a valuation of between $500 million and $1 billion, and acquired at least 800 single-family homes in 2023 alone.

182.   By contrast, Plaintiff is an individual in significant financial distress just starting on a Chapter 13 bankruptcy plan, with a high debt-to-income ratio, low credit score, no capacity to pay the "rent" or exercise her "option" to

regain title to her home, and no training nor experience in sophisticated financial transactions necessary to understand the true nature of the "Sell & Stay" arrangement.

183. By withholding 25% of the "purchase price" of Plaintiff's home as the "option agreement" price and further extracting processing fees and transaction costs of 7 % from Plaintiff, Defendants purchased Plaintiff's home for a price well below its market value and thus inadequate.

184. Plaintiff's intention in entering into EasyKnock's "Sell & Stay" transaction was to borrow cash off the equity in her home.

185. Plaintiff also intended and believed she was engaging in a mortgage-loan-like transaction with her home as collateral.

186. EasyKnock also treated this transaction more like a mortgage instrument than a sale because its "Sell & Stay" transaction on its face promised that if Plaintiff exercised her option either to repurchase the home or sell it to a third party, Plaintiff would retain the value of the home equity beyond EasyKnock's capital outlay and collection of its fees and costs associated with that short-term extension of capital.

187. Like a mortgage or home-equity line, EasyKnock's "Sell & Stay" transaction indicates that EasyKnock, like any other mortgage lender, is entitled to the principal advanced—here, the purchase price less the option value—plus all

fees and rent indicated in the "Sell & Stay" agreements, while Plaintiff would bear the risk of loss if the sale price was lower than the original house purchase price and gain the benefit of any excess in the sale.

188. Plaintiff was and continues to be in financial distress, with her debts outstripping her limited income each month such that her only recourse was to initiate bankruptcy procedings.

189. By contrast, EasyKnock is a robust company worth between $500M and $1 Billion and Kessler boasts of having purchased thousands of homes across the country.

190. Michigan courts will also find an equitable mortgage in circumstances where an important right of the homeowner has been circumvented, such as the right to redeem, or reclaim ownership of the property within a certain period of time after default. See, e.g., *Koenig*, 89 Mich. App. at 107.

191. Here, Plaintiff only has the rights of a renter and face imminent eviction proceedings because of their inability to afford the "rent" payments in the "Sell & Stay" transaction.

192. For all of the above reasons, each Plaintiff's "Sell & Stay" transaction with Defendants should be declared to be an equitable mortgage.

## COUNT II: DECLARATORY ACTION THAT EASYKNOCK'S "SELL & STAY" TRANSACTION IS NOT ARBITRABLE

193. Plaintiff incorporates all allegations above by reference here.

194. The "Sell & Stay" agreements at the heart of this lawsuit are not arbitrable because:

   a. The arbitration clauses in the Lease Agreements are invalid under the Michigan law;

   b. Properly construed as an equitable mortgage, the "Sell & Stay" transaction becomes subject to the Federal Truth in Lending Act and Home Owner Equity Protection Act, which bar arbitration of mortgage loans; and

   c. The arbitration clauses are unconscionable and thus should be voided.

### *The Lease Agreements' Arbitration Clauses are Void*

195. The Lease Agreement and Residential Real Estate Option Agreement between Plaintiff and Defendants contains an arbitration clause.[15]

196. The Residential Real Estate Sales Agreement, which conveys the title and deed to the home to EK Real Estate, does not contain any purported arbitration provision.

197. The arbitration provisions in both the Lease Agreement and Residential Real Estate Option Agreement provide that:

> "binding arbitration will not apply to a Party seeking a preliminary injunction, restraining order or other provisional equitable relief in any court whereby such Party may suffer immediate and irreparable harm for which money damages may be inadequate and impossible to calculate (including, but not limited to, a Claim where such Claim will not be subject to the informal dispute resolution procedures described

---

[15] Plaintiff Kendrick Rouser's documents appear not to have any arbitration clause.

in Section 11(b)); provided, however, that, subsequent to obtaining such preliminary injunction, restraining order or other provisional equitable relief, the Claim shall then be submitted to arbitration[.]"

198. Defendants' Lease Agreement, Section 32(f), states: "The laws of the State of MI govern the interpretation, validity, performance, and enforcement of this Lease Agreement."

199. Michigan law prohibits any provision in a residential lease that "[w]aives or alters a party's right to demand a trial by jury. . . ." Truth in Leasing Act, MCL 554.633(1)(f).

200. Thus, the Lease Agreement's arbitration provision is invalid under Michigan law and must be removed, voided and deemed unenforceable.

### *Federal Law Prohibits Arbitration Clauses in Transactions Secured by Home Equity*

201. Plaintiff's "Sell & Stay" transaction was secured by the plaintiff's equity in her home.

202. As alleged above, the "Sell & Stay" transaction is actually a disguised mortgage under Michigan law because 1) the purchaser, EasyKnock, had a vastly superior financial position to Plaintiff, 2) the purchase price for the homes was inadequate, and 3) the intent of both parties was to engage in a mortgage loan—that is, a loan secured by the equity in the home.

203. The Truth in Lending Act governs all residential mortgage loans.

204. The Truth-In-Lending Act, 15 U.S.C. § 1639c(e)(1), states that:

"[n]o residential mortgage loan and no extension of credit under an open end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction."

205. Under the federal regulations implementing and interpreting the TILA:

"A contract or other agreement for a consumer credit transaction secured by a dwelling (including a home equity line or credit secured by the consumer's principal dwelling may not include terms that require arbitration or any other non-judicial procedure to resolve any controversy or settle any claims arising out of the transaction." 12 CFR § 1026.36(h)(1).

206. These provisions of the TILA and its corresponding regulations prohibit the delegation of the issue of arbitrability to an arbitrator because they forbid the use of arbitration "for resolving any controversy…arising out of the transaction," and the issue of arbitration is but one such controversy.

207. Under the TILA, a consumer-credit transaction is one in which (1) the party to whom credit is offered or extended is a natural person, and (2) the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes. 15 U.S.C. § 1602(i).

208. Plaintiff is a "consumer" under the Truth-In-Lending Act and has standing to bring her claims under the Act, because her transaction with Defendants is a consumer-credit transaction secured by a consumer's principal dwelling under the Act.

209. The money paid by Defendants to Plaintiff is a consumer-credit transaction because it extended credit to Plaintiff, who is a natural persons, and the money and property which are the subject of the transaction is primarily for personal, family, or household purposes.

210. Plaintiff is a "consumer" under the TILA and have standing to bring their claims because their transactions with Defendants created mortgages under Michigan law, which are consumer-credit transactions under the TILA. *See, e.g., Johnson v. Novastar Mortg., Inc*., 698 F. Supp. 2d 463, 468-71 (D.N.J. 2010) and *Jackson v. EK Real Est. Servs. of NY, LLC*, No. CV H-20-3867, 2021 WL 3831990, at *4 (S.D. Tex. Mar. 26, 2021), *vacated*, No. CV H-20-3867, 2021 WL 1658571 (S.D. Tex. Apr. 27, 2021).

211. Based on all of the surrounding circumstances, including the words and actions of Defendants, including Jarred Kessler, and their representatives with whom the plaintiff communicated, Plaintiff understood her transaction with Defendants to be a loan secured by her home, not a sale of her homes or transfer of her title and interests.

### *Defendants' Arbitration Clauses are also Void and Unenforceable because they are Procedurally and Substantively Unconscionable*

212. The asserted arbitration agreement is also unenforceable because it is procedurally and substantively unconscionable.

213. Michigan law, as discussed in *Pack v. Damon Corp.*, 320 F. Supp. 2d 545, 556 (E.D. Mich. 2004), provides a two-pronged test governing the determination of whether a contract qualifies as unconscionable:

   a. What is the relative bargaining power of the parties, their relative economic strengths, the alternative sources of supply, in a word, what are their options; and

   b. is the challenged term substantively reasonable?

214. The most important factors in deciding procedural unconscionability are whether the economically weaker party had an alternative source with which it could contract, and whether the contract term was in fact negotiated." *Id*.

215. Here, Plaintiff's relative bargaining strength was weak, other loan options besides those offered by Defendants were non-existent, and no negotiations as to the terms of the sale-leaseback transactions occurred.

216. Defendants knew that Plaintiff was unsophisticated, without counsel, and desperate for money.

217. Defendants also knew that Plaintiff could not afford the monthly payments the contracts required.

218. Defendants also knew that the arbitration rules required under the contract were unreasonable because the costs of such arbitration proceedings is

prohibitively high[16], and that requiring Plaintiff, whose low-income was known to Defendants, to submit to such costly arbitration would make arbitration essentially unavailable.

219.   These facts and circumstances render the arbitration clauses in Defendants' Lease and Option agreements oppressive and unconscionable.

220.   The arbitration provisions are procedurally oppressive and unconscionable because they would be unavailable to Plaintiff, and substantively unconscionable because they would preclude Plaintiff from vindicating statutory rights through arbitration.

221.   Furthermore, to the extent there is an ambiguity in the asserted arbitration agreement, that ambiguity must be construed against Defendants as the authors of the agreements.

**COUNT III: VIOLATIONS OF THE TRUTH IN LENDING ACT (TILA) AND HOME OWNERSHIP EQUITY PROTECTION ACT (HOEPA), 15 U.S.C. §§ 1601 ET SEQ.**

222.   Plaintiff incorporates all above allegations by reference herein.

---

[16] Defendants' arbitration clause required use of the AAA's commercial arbitration procedure, which requires fees for the complainant of at least $1,725 (for claims less than $75,000) and exceed $12,000 for claims over $500,000 and less than $1,000,000. AAA, Commercial Arbitration Administrative Fees Schedule, available at
https://www.adr.org/sites/default/files/Commercial_Arbitration_Fee_Schedule_1.pdf (last visited June 5, 2024).

223.  The Truth in Lending Act (TILA) and Home Ownership Equity Protection Act (HOEPA), 15 U.S.C. §§ 1601 et seq. protect consumers engaging loans secured by the equity in their homes.

224.  Defendants deceived Plaintiff into engaging in their "Sell & Stay" transaction by convincing her to use her home as collateral for a disguised mortgage loan.

225.  The principal amount of this disguised mortgage is the purchase price less the option value as alleged in ¶¶ 98-102.

226.  The "Sell & Stay" transaction also includes charges such as "processing fees" and other items that are properly viewed as upfront "points" on the transaction, as alleged in ¶¶ 109-111 above.

227.  Defendants and their employees and agents are not licensed real estate salespersons; therefore, they are not permitted to collect charges related to facilitating a home sale such as these "processing fees."

228.  These fees are appropriately considered as up-front interest points, fees, and assessed for the initiation of these disguised mortgages.

229.  The so-called "rent" payments charged monthly to Plaintiff pursuant to the Lease Agreement portion of the "Sell & Stay" transaction are not applied or credited to Plaintiff if she were to exercise her option right to repurchase her homes.

230. Therefore, the monthly "rent" payments to Defendants alleged in ¶ 111 above, less payments of real estate taxes and insurance by Defendants, is appropriately considered as interest payments on this disguised mortgage.

231. Charges labeled as "option fees" in Defendants' "Sell & Stay" transaction, as alleged in ¶ 103 above, are also appropriately considered additional payments of interest towards these disguised mortgages.

232. As a result, the combination of upfront points, fees and settlement charges, combined with interest payments and charges in the form of "options fees" and monthly rent, created an annual percentage rates on Plaintiff's disguised mortgages as alleged in ¶ 111 above of over 18%.

233. Residential home mortgages in July of 2023 were set at interest rates of between 6% and 7.3%.

234. Because Defendants' "Sell & Stay" transaction imposed on Plaintiff an effective annual interest rate exceeding the Average Prime Offer Rate by over 6.5 percentage points and/or "points and fees" at closing that exceed 5 percent of the total loan amount, this disguised mortgage is a high rate mortgage within the meaning of the TILA and HOEPA, 15 U.S.C. § 1602(aa)(1)(B).

235. Defendants extended credit to Plaintiff under high-rate mortgages, as defined by 15 U.S.C. § 1602(aa), based on the collateral of her principal dwelling without regard to her repayment ability, including her current and expected

income, current obligations and employment, in violation of 15 U.S.C. § 1639(h).

236.   Furthermore, Defendants induced Plaintiff to borrow substantially more money than was in her ability to repay, based solely on the amount of her equity in her home.

237.   Because the transaction described herein met the HOEPA definition of a high-rate mortgage, the transaction was subject to additional disclosure requirements that must be provided three days in advance of the consummation of the transaction. 15 U.S.C. § 1639(b).

238.   Defendants did not furnish the required HOEPA disclosures to Plaintiff three days prior to her settlement.

239.   The disguised mortgage extended to Plaintiff includes abusive terms prohibited by HOEPA, including but not limited to high late payment fees, prepayment of more than two interest payments from the proceeds of the loan, and bearing the risk of losing their homes through eviction—effectively, foreclosure—for failure to make high interest rate payments.

240.   Defendants failed to deliver all the "material" disclosures required by the Truth in Lending Act to Plaintiff in connection with this transaction. In particular, Defendants failed to disclose to any Plaintiff the mandatory disclosures outlined in 15 U.S.C. § 1639(a).

241.   Defendants' disguised mortgage loan to Plaintiff based on the collateral of their home, without regard to their repayment ability, entitles Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a).

242.   Defendants' failure to give Plaintiff the disclosures required by HOEPA three days prior to settlement violates 15 U.S.C. § 1639(a) and (b), entitling Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a).

243.   Due to Defendants' violations of the TILA and HOEPA, including failure to make proper disclosures and imposing unlawful terms and conditions on Plaintiff, Plaintiff has suffered the following actual damages:

   a.   Payment of state and county transfer tax fees that would not have been charged had the "Sell & Stay" transactions been properly recorded as mortgages.

   b.   High fees and costs unlawfully assessed on them in the form of "rent" late fees.

   c.   High processing fees and other unfair charges taken out of the initial seller proceeds from the "Sell & Stay" transactions.

   d.   Compensable damages related to emotional distress from the fear of default on the "Sell & Stay" transaction leading to eviction.

   e.   Other costs and economic injuries.

244. Congress imposed statutory damages for the failure to provide the HOEPA notice three days before the loan closing to ensure that consumers understand the terms of high-cost loans and to protect them from high pressure sales tactics.

245. This notice must contain an important warning about the possibility that the consumer may lose his or her home and specific price tag information such as the annual percentage rate, the monthly payment, and the amount of any balloon payment.

246. The deprivation of this important information before closing constitutes an "informational injury" similar to those cited by the Supreme Court in *Spokeo, Inc. v. Robins,* 578 U.S. 330, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016), as examples of when the personal denial of access to information required by statute alone is a concrete injury under Article III.

247. In the case of information that a creditor must provide truthfully about an actual transaction pursuant to TILA, a violation of the statutory right to the required information constitutes a concrete injury.

248. The injury also is particularized because the information is not simply of general public interest, but directly concerns the individual consumer entitled to it. Congress placed these statutory duties upon creditors specifically for the benefit of individual consumers.

249.  The HOEPA notice is central to warning consumers accurately about the risks of the high-cost loan offered to them three days before the closing.

250.  Congress prohibited lenders from engaging in certain acts or practices, required lenders to give certain notices, and banned certain terms in loan contracts based upon evidence that homeowners in low-income and minority communities had been targeted for abusive mortgage lending practices which harmed them financially. Violations of these protections create concrete injury.

251.  Defendants based their "Sell & Stay" transaction with Plaintiff exclusively on the value of the equity of their home and without any consideration of their ability to repay this disguised mortgage. In so doing, they violated 15 U.S.C. §1639(h) and thereby entitled Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a) and extending their right to rescind the transaction until up to three years after its consummation.

252.  Defendants imposed home repair requirements on Plaintiff as a condition of the "Sell & Stay" transaction and imposed unnecessary delays and expenses on Plaintiff in the process of repaying the contractors for these repairs. In so doing, Defendants violated 15 U.S.C. § 1639(i) and thereby entitled Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a) and extending their right to rescind the transaction until up to three years after its consummation.

253. Defendants assessed fees and prepayments of interest, mistermed "rent," on Plaintiff at the initiation of their "Sell & Stay" transaction that exceeded more than two periodic payments of "rent" under these disguised mortgages. In so doing, Defendants violated 15 U.S.C. § 1639(g) and thereby entitled Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a) and extending their right to rescind the transaction until up to three years after its consummation.

254. Defendants' failure to deliver all the material disclosures required by the Truth in Lending Act to Plaintiff in connection with the transaction violates 15 U.S.C. § 1638, entitling Plaintiff to actual and statutory damages under 15 U.S.C. § 1640(a) and extending her right to rescind the transaction until up to three years after its consummation.

## COUNT IV: VIOLATIONS OF MICHIGAN'S CONSUMER PROTECTION AND UNFAIR PRACTICES ACT, MCL 445.901 ET SEQ.

255. Plaintiff incorporates all above allegations by reference here.

256. Plaintiff first learned about EasyKnock by visiting its website, which contains several deceptive and/or false statements Plaintiff relied upon in entering into the Sell & Stay transaction with EasyKnock.

257. EasyKnock promises on its website that its "Sell & Stay" program allows homeowners to "maintain the rights to any home value appreciation over the

agreed-upon Buyout costs, minus agent commission if you direct us to sell at a later date."[17]

258. This statement comes with the caveat of a fine-print footnote at the bottom of a long page simply stating, "terms and conditions apply."

259. This statement is fundamentally untrue because EasyKnock's "Sell & Stay" option agreement is subordinate to all other liens on the property, and EasyKnock immediately mortgaged Plaintiff's home.

260. EasyKnock's website also compares the Sell & Stay transaction with a home equity loan,[18] but this comparison is false and misleading because home equity loans are regulated by, *inter alia*, the Truth In Lending Act, 15 U.S.C. § 1601 et seq., while EasyKnock's "Sell & Stay" transaction is designed to evade regulation and take advantage of financially distressed homeowners.

261. In comparing its "Sell & Stay" transaction to a HELOC, EasyKnock promises that consumers can "Avoid Rising Interest." This statement is deceptive because it fails to mention that the payments under the Lease Agreement, which are effectively interest payments on the disguised mortgage, rise each year by the greater of 2.5% or the increase in the consumer price index.

---

[17] Sell & Stay, EasyKnock.com, available at https://www.easyknock.com/programs/sellstay (last visited May 30, 2024).
[18] Sell & Stay, EasyKnock.com, available at https://www.easyknock.com/programs/sellstay (last visited May 30, 2024).

262. Indeed, the consumer price index rose by 3.5% in May of 2024 and even higher in 2021 through 2023; therefore, Plaintiff's interests rates—her monthly payments on the disguised mortgages—will steadily increase each year. And if the consumer price index were to drop below 2.5%, Plaintiff's interest rate would increase at 2.5% and thus exceed general inflation trends.

263. Plaintiff's "interest" obligation also increases substantially when Defendants tack on fees, past-due rent amounts, and penalties to their unpaid balance.

264. EasyKnock's website also says that participants in the "Sell & Stay" transaction will be able to "Stay in Your Home."

265. This statement is deceptive because under the "Sell & Stay" transaction, a homeowner has at most five years to regain title to their home.

266. Absent inheriting a large amount of money or winning the lottery, a "Sell & Stay" participant can regain title to their home only if they can get a conventional mortgage.

267. As Defendants know all along, Plaintiff will not be able to get a conventional mortgage because (i) her income is too low, (ii) her debt-to-income ratio is too high, and (iii) she will not be able to increase her credit scores sufficiently within 5 years to qualify for a conventional mortgage loan.

268. Under information and belief, a majority of the EasyKnock "Sell & Stay" participants in Michigan have been forced to leave their homes in far less than the five-year term of the "Sell & Stay" transaction with Defendants.

269. Defendants and its authorized representatives, including CK, made statements that were intended to, and in fact did induce Plaintiff to enter into their "Sell & Stay" transaction.

270. Jarred Kessler, as CEO of EasyKnock, has made numerous statements that are deceptive and either wholly untrue or only partially true in order to induce consumers into the unconscionable "Sell & Stay" transaction, which is a disguised mortgage that violates federal laws and regulations regarding loans secured by collateral in a residential dwelling, and violates Michigan laws protecting consumers against oppressive interest rates on loans.

271. Each of the statements constituted "Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" under Michigan's Consumer Protection Act, MCL 405.901 et al (MCPA).

272. The MCPA, MCL 405.903, forbids, *inter alia*,

   a. **"Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction." Subsection (n).** As alleged above, Defendants' statements and actions have

caused confusion and misunderstanding by Plaintiff regarding her legal rights, obligations, and remedies regarding the "Sell & Stay" transaction.

b.  **"Causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction." Subsection (o).** As alleged above, Defendants' statements and actions have caused Plaintiff to be confused and misunderstand the terms and conditions of the disguised mortgage loans that are the "Sell & Stay" transactions.

c. **"Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."** Subsection (s). As alleged above, Defendants did not reveal essential terms of their "Sell & Stay" transaction to Plaintiff, EasyKnock was aware that Plaintiff had no capacity to afford the "rent" payments, or that EasyKnock was aware that Plaintiff would not be able to afford to regain title to her homes within 5 years.

d. **"Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it." Subsection (t).** As alleged above, Defendants persuaded Plaintiff to enter into a disguised mortgage without providing essential

disclosures that they had rights as homeowners protected by federal and state laws.

e. **Taking advantage of the consumer's inability reasonably to protect his or her interests by reason of disability, illiteracy, or inability to understand the language of an agreement presented by the other party to the transaction who knows or reasonably should know of the consumer's inability. Subsection (x).** As alleged above, Defendants did not provide Plaintiff with paper copies of their complex transactions prior to the execution of the agreements.

f. **Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits. Subsection (y).** As alleged above, Plaintiff was led to believe that Defendants' "Sell & Stay" transaction was a loan using her home as collateral and did not understand that they were not likely to be able to afford to stay in her home and would face eviction.

g. **Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is. Subsection (bb).** As alleged above, Plaintiff was led to believe that Defendants' "Sell &

Stay" transaction was a loan using her home as collateral and did not understand that she was not likely to be able to afford to stay in her home and would face eviction.

h. **Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner. Subsection (cc).** As alleged above, Plaintiff was led to believe that Defendants' "Sell & Stay" transaction was a loan using her home as collateral and did not understand that she was not likely to be able to afford to stay in her home and would face eviction.

273. Neither EasyKnock nor any of its employees or agents are registered in Michigan or federally as licensed real estate salespersons or brokerages.

274. Neither EasyKnock nor any of its employees or agents are registered in Michigan or federally as licensed lenders or home mortgage brokers.

275. The MCPA does not apply to "(a) A transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States."

276. EasyKnock and its agents are not registered or licensed to conduct home sales or home loans; therefore, their conduct alleged herein is not authorized by a regulatory board or officer under any state or federal authority. *See,* allegations

regarding Defendants' violation of the Michigan Mortgage Brokers, Lenders, Servicers and Licensing Act by operating without licenses, ¶¶ 281-290, *infra*.

277.   Thus, EasyKnock's conduct is subject to the MCPA because their actions as unlicensed mortgage lenders are not authorized by any law or authority of Michigan or the United States.

278.   The MCPA authorizes any person to bring a declaratory action or seek an injunction against a person "who is engaging in or is about to engage in a method, act, or practice that is unlawful under [MCL 405.903]." MCL 445.911(1).

279.   The MCPA entitles "a person who suffers loss as a result of a violation" of MCL 405.903 to collect their actual damages, as well as attorney's fees. MCL 445.911(2).

280.   As a result of these misrepresentations and violations of the MCPA, Plaintiff has suffered actual damages, included but not limited to:

a.   Payment of state and county transfer tax fees that would not have been charged had the "Sell & Stay" transactions been properly recorded as mortgages.

b.   High fees and costs unlawfully assessed on them in the form of "rent" late fees.

c. High processing fees and other unfair charges taken out of the initial seller proceeds from the "Sell & Stay" transactions.

d. Compensable damages related to emotional distress from the fear of default on the "Sell & Stay" transaction leading to eviction.

e. Other costs and economic injuries.

## COUNT V: VIOLATIONS OF THE MORTGAGE BROKERS, LENDERS, AND SERVICERS LICENSING ACT, MCL 445.1651 ET SEQ. ("MBLA")

281. Plaintiff incorporates all allegations above by reference here.

282. Defendants are "persons" under the MBLA.

283. Plaintiff is a "person" under the MBLA.

284. It is a criminal violation of the MBLA to engage in the business of brokering, lending or servicing mortgage loans without a license. MCL 445.1679(1)(a).

285. Defendants admit on their website that neither they nor their employees nor their agents are licensed to engage in mortgage lending, brokering or servicing in the state of Michigan.

286. Defendants brokered and served as lenders of the disguised mortgages with Plaintiff that caused her to lose title of her home.

287. Defendants also serviced these disguised mortgages because they remained the "landlords" on the so-called leases of Plaintiff's homes and collected the "rent" payments, which were effectively interest payments on these mortgages.

288. It is a criminal violation of the MBLA to transfer or assign a mortgage loan or a security directly representing an interest in 1 or more mortgage loans before the disbursement of 75% or more of the proceeds of the mortgage loan to, or for the benefit of, the borrower. MCL 445.1679(1)(b)

289. Defendants registered a mortgage loan they borrowed on Plaintiff's home on the same day as their registered the deed transfer by Plaintiff to Defendants of her home. In light of the "option value" and illegitimate fees retained by Defendants in their "Sell & Stay" transaction with Plaintiff, Plaintiff had not received 75% of the proceeds of her disguised mortgage loan at the time Defendants registered their own mortgage loan on this same home.

290. As a result of Defendants' above violations of the MBLA, Plaintiff suffered the actual damages, including but not limited to:

a. Payment of state and county transfer tax fees that would not have been charged had the "Sell & Stay" transactions been properly recorded as mortgages.

b. High fees and costs unlawfully assessed on them in the form of "rent" late fees.

c. High processing fees and other unfair charges taken out of the initial seller proceeds from the "Sell & Stay" transactions.

d. Compensable damages related to emotional distress from the fear of default on the "Sell & Stay" transaction leading to eviction.

e. Other costs and economic injuries.

291. The MBLA entitles Plaintiff to bring an action to obtain a declaratory judgment that specific practices violate the Act, to obtain an injunction against Defendants regarding practices that violate the Act, and to be awarded the greater of $250 or actual damages resulting from violations of the Act, along with attorney's fees and costs. MCL 445.1681.

### COUNT VI: VIOLATIONS OF THE MICHIGAN USURY ACT, MCL 438.31 ET SEQ.

292. Plaintiff incorporates all allegations above by reference here.

293. Defendants, their employees, and their agents are not registered in the State of Michigan as licensed real estate salespersons or as mortgage lenders.

294. Under the Michigan Usury Act, only licensed and regulated lenders may assess reasonable and necessary charges for costs related to mortgage loans, such as loan processing fees, recording fees, title examination or title insurance, and preparation of deeds and appraisals. MCL 438.31a.

295. Inspection fees may not be charged to the borrower. MCL 438.31a.

296. When evaluating whether an interest rate on a residential home mortgage violates the Michigan Usury Act, taxes and fees are included as effective interest payments.

297.  Home mortgage loans may not include terms that allow for the initial rate of interest to increase. MCL 438.31c(2).

298.  The maximum rate of interest, including fees and charges, for mortgage loans not issued by approved lenders is 11%. MCL 438.31c(5)-(7).

299.  Since Defendants and their employees and agents are not licensed or approved lenders, the disguised mortgage they imposed on Plaintiff may not exceed 11%, inclusive of fees and charges.

300.  Defendants imposed disguised mortgages with interests exceeding 11% for Plaintiff, as alleged in ¶¶ 102-111.

301.  The Michigan Usury Act bars Defendants from recovery of any unpaid interest, fees, delinquency or collection charges, attorney fees or court costs and entitles Plaintiff to recover her attorney's fees and costs related to this action. MCL 438.32.

## COUNT VII: FRAUD IN THE INDUCEMENT

302.  Plaintiff incorporates all above allegations by reference herein.

303.  Defendants, through their website and through their employees' and agents' direct conversations with Plaintiff made specific, material representations that the "Sell & Stay" transaction was comparable to a home equity line of credit with her homes serving as collateral on that loan, that Plaintiff would be able to restore her credit ratings within the 5 years of the "Sell & Stay" transaction,

that Plaintiff would be able to regain title to her home, and that Plaintiff would be able to stay in her home.

304. Each of these material representations was false.

305. Defendants and their agents and employees knew at the time that they made these representations that these statements were false or that there was no basis to believe in the truth of their assertions.

306. Defendants knew enough about Plaintiff's financial distress at the time they induced her to enter into the "Sell & Stay" transaction that Plaintiff would not be able to afford the monthly rent and had no capacity to repair her credit or secure the funds necessary to execute the Option Agreement to regain title to her home within five years.

307. Defendants and their agents and employees made these false statements for the purpose of inducing Plaintiff to engage in the "Sell & Stay" transaction.

308. Plaintiff acted in reliance on these false statements to enter in to the "Sell & Stay" transaction.

309. As a result of entering into the "Sell & Stay" transactions, Plaintiff lost the title to her home, received substantially less than the value of her equity in her homes, and now faces eviction from her home.

## COUNT VIII: UNJUST ENRICHMENT

310. Plaintiff incorporates all allegations above by reference here.

311.  In Defendants' "Sell & Stay" transaction, Defendants obtained title to Plaintiff's home for far less than the market value.

312.  Defendants unilaterally set the terms of the "Sell & Stay" transaction, which entitled them to collect usurious interest rates, high late fees, along with other fees, penalties and charges to which they were not entitled, as well as the right to evict Plaintiff from her home when she inevitably could not afford the "rent" and late payment penalties.

313.  Defendants forced Plaintiff to fund escrow accounts for repairs on her home, but never paid Plaintiff the interest earned on these accounts. Therefore, Defendants improperly and unlawfully gained the benefits of these funds and interest earned on them.

314.  Under information and belief, Defendants did not establish arms-length escrow accounts for these repairs and improperly and unlawfully retained full use of these funds along with the interest earned on them for months, and in some cases years, while repairs were pending.

315.  Furthemore, the "option value" held by Plaintiff is "automatically subject and subordinate to" all liens and mortgages that would come to encumber the property.

316. On or about the same day that EasyKnock recorded the warranty deed transfer of Plaintiff's home from Plaintiff to EasyKnock, Defendants also recorded a mortgage loan on that same property.

317. As a result of these benefits received by Defendants at Plaintiff's expense, Plaintiff has lost title to her homes and faces eviction from her home.

318. Therefore, Defendants have unjustly enriched themselves from this transaction with Plaintiff and harmed Plaintiff in the process.

## REQUEST FOR RELIEF

Based on the above allegations, Plaintiff requests the following relief:

### Equitable Remedies Pertaining to Counts I and II:

Based on the above allegations above and specific to Counts I and II seeking equitable relief, Plaintiff requests the following relief from the Court:

A. An order and judgment declaring Plaintiff's transactions with Defendants to be an equitable mortgage and not a deed absolute.

B. An order and judgment declaring that Plaintiff is not bound by an enforceable agreement to arbitrate her claims against Defendants;

C. An order and judgment declaring that Plaintiff may pursue her claims in a judicial forum rather than an arbitration forum; and

D. An order awarding such other relief the court deems just and equitable.

### Relief Pertaining to Count III, Violations of the TILA and HOEPA:

Based on the above allegation, Plaintiff respectfully requests the following relief pursuant to 15 U.S.C. §§ 1635(a), 1639(j), and 1640(a):

A. A declaration that the Plaintiff is not liable for any finance charges or other charges imposed by Defendants; specifically, a declaration that all fees, charges, and rents assessed by Defendants are interests and finance charges on a disguised mortgage and as such, Plaintiff is not liable for any of these charges other than amounts paid by Defendants for real estate property taxes or homeowners insurance;

B. A declaration that the security interest in Plaintiff's property created under the transaction is void, and an order requiring Defendants to release such security interest; specifically, a declaration that the absolute deed for their home conveyed by Plaintiff to Defendants must be reverted to Plaintiff in a quit claim or other appropriate deed transfer process;

C. Return of any money or property given by the Plaintiff to anyone, including the Defendants, in connection with the "Sell & Stay" transaction;

D. Statutory damages of $12,000 to Plaintiff (consisting of $4,000 for the disclosure violation and $4,000 each for the violations of 15 U.S.C. § 1639(g), (h), and (i).

E.  Additional damages pursuant to 15 U.S.C. § 1640(a)(4) in the amount of all finance charges and fees paid by Plaintiff, for each non-disclosure violation as alleged in ¶¶ 103-111 above;

F.  Actual damages in an amount to be determined at trial;

G.  An award of reasonable attorney fees and costs; and

H.  Such other relief at law or equity as this Court may deem just and proper.

### Relief Pertaining to Counts IV, V and VI

Based on the above allegations pertaining to violations of the Michigan Consumer Protection Act, the Mortgage Broker's Act, and the Michigan Usury Act, Plaintiff requests the following relief:

A.  Actual damages to be determined at trial and not limited to compensation for the following:

   i. Payment of state and county transfer tax fees that would not have been charged had the "Sell & Stay" transactions been properly recorded as mortgages.

   ii. High fees and costs unlawfully assessed on them in the form of "rent" late fees.

   iii. High processing fees and other unfair charges taken out of the initial seller proceeds from the "Sell & Stay" transactions.

iv. Compensable damages related to emotional distress from the fear of default on the "Sell & Stay" transaction leading to eviction.

v. Other costs and economic injuries.

B.  An Order declaring all fees, rents, and other payments collected from Plaintiff to be unlawful collection of usurious interest and that all such collected monies are to be considered payments toward the principal loan amounts as alleged in ¶ 102.

C.  An order requiring any overpayment by Plaintiff of the principal loan amount to be immediately returned to Plaintiff with an interest payment to Plaintiff for that overage at the current average interest rate for residential mortgage loans.

D.  An Order prohibiting Defendants from collecting any form of interest or fees from Plaintiff.

E.  An Order setting the maximum interest to be charged by Defendants to Plaintiff on any remaining principal payments at 0%.

F.  An Order setting a 15-year, principal-only monthly payment schedule for the remaining principal owed by Plaintiff to Defendants.

G.  An award of reasonable attorney fees and costs; and

H.  Such other relief at law or equity as this Court may deem just and proper.

**Relief Pertaining to Count VII, Fraud in the Inducement**

Based on the above allegation, Plaintiff respectfully requests the following relief related to her claim of Fraud in their Inducement as alternative to relief under Counts I and II.

A. An Order Declaring her "Sell & Stay" with Defendants void; and

B. An Order awarding all other remedies deemed equitable and just in light of Defendants' fraud perpetrated against Plaintiff.

**Relief Pertaining to Count VIII, Unjust Enrichment**

Based on the above allegation, Plaintiff respectfully requests the following relief related to her claim of Unjust Enrichment:

A. An Order declaring that Defendants were unjustly enriched by their "Sell & Stay" transaction with Plaintiff; and

B. An Award to Plaintiff in the value of the unjust enrichment as follows:

    i.    All fees, assessments and monies collected by Defendants through the "Sell & Stay" transaction,

    ii.    An award of all Interests actually earned or that could have been earned on funds held in escrow for repairs to Plaintiff's homes,

    iii.    An award of all late fees and penalties collected, and

iv.  An Award of all monies collected through "rent" that exceed the actual value of the cash paid to Plaintiff and loan repayments credited to Plaintiff in the "Sell & Stay" transaction.

C. Restitution in an amount determined necessary to deprive Defendants of their ill-gotten gains, obtained unjustly from Plaintiff and at Plaintiff's expense.

Plaintiff's sworn statement Appears on the Following Page.

**SIGNATURE AND VERIFICATION OF COMPLAINT BY PLAINTIFF**

I declare under penalty of perjury that the facts stated in this Complaint pertaining to my experience with EasyKnock and its representatives are true and accurate to the best of my knowledge and information.

Signed: *Christine Zeld*

Christine Zeld

Subscribed and sworn to before me

this 12th day of JUNE, 2024.

_____
Notary Public

CARRIE BECHILL
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF OAKLAND
My Commission Expires   October 7, 2027
Acting in the County of OAKLAND

Respectfully Submitted by:

*/s/Robin B. Wagner*
Pitt McGehee Palmer Bonanni & Rivers
Robin B. Wagner (P79408)
Kevin M. Carlson (P67704)
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
rwagner@pittlawpc.com
kcarlson@pittlawpc.com

Dated: July 1, 2024

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| Christine Zeld, | |
| Plaintiffs, | Case No. 24-cv- |
| v. | Hon. United States District Judge |
| EasyKnock, Inc., EK Real Estate Fund 1, LLC, , | Hon. United States Magistrate Judge |
| Defendants. | |

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues within the causes of action.

Respectfully Submitted by:

*/s/Robin B. Wagner*
Pitt McGehee Palmer Bonanni & Rivers
Robin B. Wagner (P79408)
Kevin M. Carlson (P67704)
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
rwagner@pittlawpc.com
kcarlson@pittlawpc.com

Dated: July 1, 2024